AUSA: David J. Robles

23 MAG 6378

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GILBERT BELL FERNANDEZ,<br>a/k/a "Macho Coca,"<br><br>Defendant. | **SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. § 3238 and 21 U.S.C. § 963<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

BRENDAN M. LEDDY, being duly sworn, deposes and says that he is a Special Agent of the Drug Enforcement Administration ("DEA"), and charges as follows:

**COUNT ONE**
**(Narcotics Importation Conspiracy)**

1. From at least in or about March 2022, up to and including the present, in Costa Rica, Colombia, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, GILBERT BELL FERNANDEZ, a/k/a "Macho Coca," the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of the conspiracy that GILBERT BELL FERNANDEZ, a/k/a "Macho Coca," the defendant, and others known and unknown, would and did import into the United States and into the customs territory of the United States from a place outside thereof a controlled substance, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

3. It was further a part and an object of the conspiracy that GILBERT BELL FERNANDEZ, a/k/a "Macho Coca," the defendant, and others known and unknown, would and did manufacture, possess with intent to distribute, and distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

4. The controlled substance that GILBERT BELL FERNANDEZ, a/k/a "Macho Coca," the defendant, conspired to (a) import into the United States and into the customs territory of the United States from a place outside thereof; and (b) manufacture, possess with intent to distribute, and distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance

of 12 miles of the coast of the United States, was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 960(b)(1)(B).

(Title 21, United States Code, Section 963;
and Title 18, United States Code, Section 3238.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5. I have been a Special Agent with the DEA since approximately 2003. I am currently assigned to the DEA Special Operations Division's Bilateral Investigations Unit, which focuses on international criminal activities, including international narcotics trafficking, weapons trafficking, and money laundering. This affidavit is based on my participation in the investigation of this matter, including my communications with other law enforcement officers and other individuals, my review of photographs, videos, and recorded communications, and my review of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the offenses cited above, it does not include all of the facts that I have learned during the course of the investigation. Where the contents of communications with others and statements by others are reported herein, they are reported in substance and in part, except where otherwise indicated.

6. Based on my participation in this investigation, including my conversations with other law enforcement agents and other individuals, my review of DEA and foreign law enforcement reports, and my review of photographs, videos, and electronic and recorded communications, as well as draft transcripts, translations, and summaries of such communications,[1] I have learned the following, in substance and in part:

**Overview**

a. GILBERT BELL FERNANDEZ, a/k/a "Macho Coca," the defendant, is an international narcotics trafficker based in Costa Rica who sources ton-quantities of cocaine from Colombia, through Costa Rica, for ultimate distribution in various countries, including the United States. BELL FERNANDEZ, who also owns commercial fishing businesses in Costa Rica, is believed to control the distribution of ton-quantities of cocaine imported and exported through the Port of Limón, a seaport in the Limón Province of Costa Rica that serves as a major transshipment point for U.S.-bound cocaine.

b. Since at least in or about March 2022, BELL FERNANDEZ and members of his drug trafficking organization (the "DTO"), have participated in electronic, telephonic, and in-person communications with two confidential sources ("CS-1" and "CS-2," and, collectively,

[1] Descriptions of electronic and recorded communications in this Complaint are based in part on draft Spanish-to-English translations prepared by DEA linguists, which are subject to change.

the "CSes")[2] who, working at the direction of the DEA, have been posing as associates of an international drug trafficking ring that distributes ton-quantities of cocaine in the United States for redistribution.

c. In or about March 2022, members of the DTO began discussions with CS-1 about the purchase of large shipments of cocaine that they wanted to transport through Costa Rica for CS-1's purported customers in New York and elsewhere. During these initial conversations, the majority of the which were audio recorded, the DTO members confirmed that BELL FERNANDEZ was the leader of the DTO, and that the DTO could provide the CSes with ton-quantity shipments of cocaine.

d. After several weeks of conversations with members of the DTO, they introduced CS-1 to BELL FERNANDEZ as the "father," or leader of the DTO. In the months that followed, CS-1 spoke directly with BELL FERNANDEZ on multiple occasions, in person and telephonically, to negotiate the terms of a cocaine distribution partnership. During those conversations, most of which were recorded, BELL FERNANDEZ confirmed, among other things, that he had the means to export ton-quantities of cocaine out of Costa Rica and that the DTO could arrange for CS-1 to purchase a sample of the DTO's cocaine in advance of potential larger deals in the future.

e. After negotiating the purchase of this sample, in or around February 2023, with BELL FERNANDEZ's approval, a member of the DTO provided CS-1 with a sample of one kilogram of the DTO's cocaine in Costa Rica in exchange for approximately $6,000 in United States currency. Following CS-1's acquisition of the one-kilogram sample, CS-1 continued conversations with BELL FERNANDEZ and other members of the DTO about the large-scale distribution partnership they had been negotiating. In early August 2023, the CSes met with BELL FERNANDEZ in Costa Rica to continue discussions about a potential cocaine deal. During that meeting, which was audio and video recorded, BELL FERNANDEZ and the CSes discussed BELL FERNANDEZ providing the CSes with approximately 700 kilograms of cocaine and eventually transporting that cocaine to New York City. BELL FERNANDEZ then agreed to meet the CSes in Panama to pick up the money for the deal.

---

[2] CS-1 has provided information to the DEA in exchange for financial compensation since approximately 2004. CS-1 also has a prior history of narcotics trafficking. CS-2 has provided information to the DEA in exchange for financial compensation since approximately 2003. CS-2 has a criminal history that includes a conviction for drug trafficking. Information from CS-1 and CS-2 has been deemed reliable and corroborated by other evidence, including the recorded communications and seized narcotics described herein. All actions by the CSes described herein were taken at the direction of law enforcement officials.

**March 2022 – May 2022: Initial Conversations with DTO Members**

7. Based on my participation in this investigation, including my conversations with other law enforcement agents and other individuals, my review of DEA and foreign law enforcement reports, and my review of photographs, videos, and electronic and recorded communications, as well as draft transcripts, translations, and summaries of such communications,[3] I have learned the following, in substance and in part:

a. First, between in or about March and May 2022, CS-1 had multiple recorded communications with members of the DTO, in person and over the phone, about the DTO's ability to source thousands of kilograms of cocaine for distribution to the United States. Members of the DTO confirmed for CS-1 that they had, at various times, thousands of kilograms of cocaine available for distribution, and one member of the DTO ("CC-1") drove CS-1 to locations where this cocaine was stored. After CS-1 inquired about the owner of the cocaine, members of the DTO confirmed that the owner was "Macho Coca," later confirmed to be BELL FERNANDEZ, and CC-1 sent CS-1 the photograph depicted below, which, based on my review of a copy of BELL FERNANDEZ's Costa Rican identification card (or "cedula"), I recognize to be BELL FERNANDEZ:



**May 2022 – June 2022: Introduction to BELL FERNANDEZ**

b. On or about May 11, 2022, at approximately 12:30 a.m., CS-1 made a recorded audio call to one of the members of the DTO who had been introduced to CS-1 in or about earlier that month ("CC-2"). On the call, CC-2 told CS-1, "let me pass you to the father." Another individual, later identified as BELL FERNANDEZ, then got on the phone to speak with

[3] Descriptions of electronic and recorded communications in this Complaint are based in part on draft Spanish-to-English translations prepared by DEA linguists, which are subject to change.

CS-1. On the call, BELL FERNANDEZ discussed his ability to provide CS-1 with hundreds of kilograms of cocaine. CS-1 told BELL FERNANDEZ that CS-1 wanted to ship cocaine to Miami, New York, and Boston, to which BELL FERNANDEZ responded, "we are here ready to do it." BELL FERNANDEZ also told CS-1 to deal directly with CC-2 and invited CS-1 to Costa Rica to meet with BELL FERNANDEZ. BELL FERNANDEZ then told CS-1 that he would have CC-2 send to CS-1 BELL FERNANDEZ's phone number. Shortly thereafter, CS-1 received a text message from CC-2 with a phone number to reach BELL FERNANDEZ (the "BELL FERNANDEZ Number").[4]

c. On or about May 13, 2022, CS-1 made a recorded audio call to the BELL FERNANDEZ Number and spoke with an individual whom I believe, based on my involvement in this investigation, to be BELL FERNANDEZ.[5] On the call, CS-1 told BELL FERNANDEZ that CS-1 would soon visit Costa Rica and asked BELL FERNANDEZ if he could provide CS-1 with a "dulcecito," which I know, from my training and experience, to be a slang term for a sample of cocaine, and BELL FERNANDEZ responded affirmatively. CS-1 then inquired about the price of the cocaine, but BELL FERNANDEZ stated that they could speak further in person.

d. On or about May 16, 2022, CS-1 made another recorded audio call to the BELL FERNANDEZ Number and spoke with BELL FERNANDEZ. On the call, CS-1 confirmed that CS-1 would travel to Costa Rica on May 24, 2022, and once again asked BELL FERNANDEZ for a sample of cocaine, which BELL FERNANDEZ agreed to provide.

e. On or about May 23, 2022, CS-1 traveled to Costa Rica to meet with BELL FERNANDEZ. Based on earlier communications, CS-1 expected BELL FERNANDEZ to call CS-1 to set up a subsequent meeting. Approximately three days later, after BELL FERNANDEZ had not called CS-1, CS-1 called another member of the DTO with whom CS-1 had previously spoken about obtaining cocaine from the DTO ("CC-3") and told CC-3 that CS-1 would not have time to meet BELL FERNANDEZ on this trip and would wait to speak with "El Senor," referring to BELL FERNANDEZ, another time. CS-1 then asked CC-3 for the name of "El Senor," to which CC-3 responded, "Gilbert Bell." CC-3 also told CS-1 that BELL FERNANDEZ got "cold" and did not meet with CS-1 that day because BELL FERNANDEZ did not like the way CS-1 went about asking for a sample of cocaine.

**June 2022 Meetings with BELL FERNANDEZ**

f. After a series of subsequent communications, on or about June 15, 2022, CS-1 returned to Costa Rica to meet with CC-3 and BELL FERNANDEZ. That same day, CC-1 drove CS-1 to Limón, Costa Rica, where CS-1 met with CC-3 at CC-3's restaurant. CC-3 then drove CS-1 to a small rock quarry, which based on intelligence received from Costa Rican law

---

[4] CS-1 was unable to capture the text message due to a setting that made CC-2's text messages disappear shortly after they were read. However, CS-1 relayed the contents of the text messages to the DEA shortly after they were received, and they were then memorialized in a DEA report.

[5] As described further below, CS-1 later had in-person interactions with BELL FERNANDEZ. CS-1 has confirmed that BELL FERNANDEZ was the same individual whose voice CS-1 heard during calls with the BELL FERNANDEZ Number.

enforcement authorities, I know to be located across from the known residence of BELL FERNANDEZ. CC-3 then introduced CS-1, who was wearing an audio recording device, to BELL FERNDANDEZ, who was at the rock quarry when CS-1 and CC-3 arrived.

g. During the meeting, BELL FERNANDEZ explained that he can source cocaine from Colombia and transport it "up there," which CS-1 understood to be a reference to the United States. BELL FERNANDEZ further explained that he can arrange sources, transportation, and safe storage for cocaine in Costa Rica. While discussing his ability to provide logistics and transportation for cocaine loads from Colombia, BELL FERNANDEZ told CS-1 that there had been times when people tried to take advantage of BELL FERNANDEZ and BELL FERNANDEZ had them killed. BELL FERNANDEZ also explained that he has access to boats to transport ton-quantities of cocaine and that he has relied upon corrupt military officials, including in Honduras, to facilitate his drug trafficking. BELL FERNANDEZ noted, however, that he did not want to use the ports to export cocaine because of recent law enforcement activity, explaining that a cocaine load of approximately 1,260 kilograms had previously been seized, part of which belonged to BELL FERNANDEZ, and that another approximately 600 kilograms of cocaine belonging to BELL FERNANDEZ were seized sometime thereafter.[6] BELL FERNANDEZ also boasted of certain prior success in cocaine distribution, and, for example, told CS-1 that he had previously personally transported one and a half tons of cocaine by sea from Colombia to Fort Lauderdale, Florida.

h. BELL FERNANDEZ then discussed with CS-1, among other things related to a cocaine distribution partnership, the quality of the cocaine that BELL FERNANDEZ was able to obtain. Specifically, BELL FERNANDEZ discussed that the DTO was able to access "product" (i.e., cocaine) of 90 to 95 percent purity. CS-1 once again asked if BELL FERNANDEZ could provide a sample of the cocaine, and BELL FERNANDEZ agreed to do so.

i. On or about June 16, 2022, CS-1 met CC-3 at CC-3's restaurant in Limón, Costa Rica. CC-3 showed CS-1 a photograph of a kilogram of cocaine that CC-3 told CS-1 was a portion of the supply that BELL FERNANDEZ could provide. CC-3 also provided CS-1 with a voice recording that BELL FERNANDEZ had previously sent to CC-3, in which BELL FERNANDEZ stated that BELL FERNANDEZ had the sample CS-1 requested available.

j. Later that same day, CS-1 received a call from another member of the DTO ("CC-4"), who advised CS-1 that CC-4 worked with BELL FERNANDEZ, that BELL FERNANDEZ was weary of doing a deal with CC-3, and that CS-1 should deal directly with CC-4.[7] CS-1 and CC-4 agreed to meet the next day.

k. On or about June 17, 2022, at approximately 9:35 a.m., CS-1, who was wearing an audio and video recording device, met with BELL FERNANDEZ, CC-2, and CC-4 at

---

[6] Based on my review of DEA reports, I know that on or about October 8, 2020, the United States Coast Guard intercepted a go-fast vessel in the Eastern Pacific that was transporting 1,260 kilograms of cocaine. In addition, on or about April 10, 2022, approximately 631 kilograms of cocaine were seized by Costa Rican authorities at the Port of Moin, a seaport in the Limón Province of Costa Rica near the Port of Limón.

[7] This call was not recorded.

the rock quarry near BELL FERNANDEZ's residence in Limón, Costa Rica. During the meeting, BELL FERNANDEZ and CS-1 again discussed the purity of the cocaine that CS-1 would need, the sample of cocaine that would be provided to CS-1, and BELL FERNANDEZ's willingness to assist CS-1 with drug trafficking activities in Costa Rica. A screenshot of BELL FERNANDEZ taken from CS-1's video recording during the meeting is below:



**February 2023: The One Kilogram Sample of Cocaine**

l. Over the next several months, CS-1 maintained communications with CC-3 and CC-2 about their cocaine distribution partnership. On or about February 2, 2023, CS-1 made a recorded call to CC-3, in which CS-1 advised CC-3 that CS-1 would be traveling to Costa Rica on or about February 20, 2023. On the call, CS-1 told CC-3 that CS-1 only wanted to work with BELL FERNANDEZ and CC-3, not CC-2. CS-1 also told CC-3 that CS-1 would meet with CC-3 and BELL FERNANDEZ (who CS-1 referred to as "El Viejo") in Costa Rica to purchase a sample of one kilogram of cocaine.

m. On or about February 20, 2023, CS-1 traveled to San Jose, Costa Rica. The next day, CC-1 drove CS-1 to Limón, Costa Rica to meet with CC-3 at CC-3's restaurant. At one point during the meeting, BELL FERNANDEZ called CC-3 and CC-3 handed the phone to CS-1. BELL FERNANDEZ told CS-1 that he would see what he could do about getting CS-1 a sample of the cocaine. Shortly thereafter, CC-3 told CS-1 that CC-3 would go to BELL FERNANDEZ's house to pick up the sample. CC-3 then left the restaurant and returned approximately 20 minutes later. When CC-3 arrived back at the restaurant, CS-1 paid CC-3 approximately $6,000 in the bathroom of the restaurant. CS-1 then went outside and got into SEQUIRA-SOLIS's vehicle. CC-3 then approached CC-1's vehicle, with CC-4, and CC-3 threw a rectangular shaped object into CC-1's vehicle. CS-1 then told CC-3 to thank BELL FERNANDEZ for the sample and left the location.[8]

[8] CS-1 was able to audio record a portion of this exchange with CC-3.

n. The DEA later tested the contents of the rectangular shaped object that CC-3 provided to CS-1. The contents of the object tested positive for cocaine and weighed approximately one kilogram. A photograph of the sample of cocaine provided to CS-1 is below:



o. On or about February 22, 2023, CS-1 made a recorded call to CC-3. On the call, CS-1 asked CC-3 how many kilograms of cocaine CC-3 had access to with the same marking as the sample kilogram that CC-3 had previously provided to CS-1. CC-3 responded that there were "hundreds" and that the purity of the cocaine was 97 percent. CS-1 then explained that the quality of the cocaine was important because it was being sent to the United States, and asked CC-3 to speak with "El Viejo" (referring to BELL FERNANDEZ) about the quantity of cocaine that the DTO could provide to CS-1. Shortly thereafter, CC-3 texted CS-1 a screenshot of a news article concerning a recent Costa Rican law enforcement operation that resulted in the demolition of certain properties believed to be used by criminal organizations, at least one of which contained boats in an open-air warehouse which were believed to have been manufactured by BELL FERNANDEZ to transport narcotics.[9] CC-3 then texted CS-1 that BELL FERNANDEZ was "hot" (i.e., that BELL FERNANDEZ was facing scrutiny from law enforcement). Later that evening, CC-3 sent CS-1 several photographs of various stamped and packaged kilograms of cocaine. Some of those photographs are below:

[9] The article is available at https://www.diarioextra.com/Noticia/detalle/494011/macho-coca-ser-a-fabricante-de-lanchas-narco.




p. On or about February 23, 2023, CS-1 made a recorded call to CC-3. On the call, CS-1 and CC-3 discussed the Costa Rican law enforcement operation described above and they agreed to pause future cocaine transactions until law enforcement scrutiny on BELL FERNANDEZ eased.

**<u>April 2023 – June 2023: Additional Communications with CC-3</u>**

q. Over the next several months, CS-1 maintained communications with CC-3 about their cocaine distribution partnership. CC-3 told CS-1 that, due to the law enforcement scrutiny described above, and additional scrutiny on BELL FERNANDEZ because BELL FERNANDEZ's brother was accused of murdering a rival drug trafficker, BELL FERNANDEZ went into hiding. Nonetheless, CC-3 and CS-1 engaged in several communications about, among other things, security for cocaine loads; the DTO's use of Costa Rican armed forces to facilitate their cocaine trafficking; and potential cocaine deals.

r. Subsequently, on or about June 26, 2023, the CSes traveled to Costa Rica, once again to meet with CC-3. That same day, CC-3 brought the CSes to a residence in Limón. Shortly after the CSes' arrival at this residence, a vehicle with another individual ("Individual-1") and Individual-1's associates arrived. CC-3 told the CSes that they would now be working with Individual-1 and Individual-1's associates to conduct the anticipated cocaine deal, because BELL FERNANDEZ was busy with BELL FERNANDEZ's brother's recent issues (described above in ¶ 7(q)).

**<u>July 2023 – August 2023: Communications and Meeting with BELL FERNANDEZ</u>**

s. Instead of continuing to engage with CC-3, in the days and weeks that followed, CS-1 contacted BELL FERNANDEZ directly to finalize the larger cocaine deal they had previously discussed. On or about July 31, 2023, CS-1 made a recorded audio call to BELL FERNANDEZ. On the call, CS-1 told BELL FERNANDEZ that CS-1 had arrived in Costa Rica and would like to meet BELL FERNANDEZ the following day. BELL FERNANDEZ agreed to meet with CS-1.

t. On or about August 1, 2023, the CSes met with BELL FERNANDEZ in San Jose, Costa Rica. The meeting was audio and video recorded. During the meeting, the CSes

spoke with BELL FERNANDEZ about purchasing approximately 700 kilograms of cocaine and eventually transporting that cocaine to New York City. The CSes agreed to pay half of the money up front, then the other half of the money when they received the cocaine from BELL FERNANDEZ. The CSes told BELL FERNANDEZ that their money was in Panama and asked BELL FERNANDEZ if he would travel to Panama to pick up the money, which BELL FERNANDEZ agreed to do. The CSes and BELL FERNANDEZ also agreed on a price of approximately $4,100 per kilogram of cocaine. After agreeing on the logistics of the deal, BELL FERNANDEZ asked for additional time to start working on the deal. BELL FERNANDEZ explained that he was currently facing problems with Honduran drug traffickers working in Limón, and that he had growing concerns that things would get violent with these Honduran traffickers. CS-1 told BELL FERNANDEZ that the CSes knew Mexican "sicarios" (i.e., assassins) that could help BELL FERNANDEZ, but BELL FERNANDEZ responded that he had his own sicarios.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of GILBERT BELL FERNANDEZ, a/k/a "Macho Coca," the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

**/s Brendan M. Leddy** (By Court with Authorization)
BRENDAN M. LEDDY
Special Agent
Drug Enforcement Administration

Sworn to me through the
transmission of this Affidavit
by reliable electronic means (telephone),
pursuant to Federal Rule of Criminal Procedure 4.1,
this 13th day of September, 2023

THE HONORABLE SARAH L. CAVE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK